**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CRIMINAL ACTION** |
| *v.* | **NO. 21-355-KSM** |
| **JASON AUGUSTUS.** | |

**MEMORANDUM**

**MARSTON, J.**                                                                                  **March 14, 2022**

Defendant Jason Augustus has been charged with possession of a firearm and

ammunition by a felon, in violation of 18 U.S.C. § 922(g)(1).  (Doc. No. 1.)  He now moves to

suppress the evidence on which the charge is based, arguing that the firearm and ammunition

seized during a traffic stop were obtained by means of an illegal search and seizure and that his

admissions to marijuana use and illegal gun possession arose as a direct result of his unlawful

detention.[1]  (Doc. No. 10.)

This Court held an evidentiary hearing on Defendant's motion to suppress on February

10, 2022.  (*See* Doc. No. 17.)  During the hearing, Philadelphia Police Department ("PPD")

Officers Francis Coyle, Marc Rothman, and Christina Rios testified.  Each officer's body camera

footage of the vehicle stop involving Defendant was introduced into evidence (Gov't Exs. 2, 3,

---

[1] Defendant moves to suppress two statements which occurred at different times during the stop.  First, immediately upon being approached by the officers, Defendant admitted that he used marijuana earlier but that he had a valid medical marijuana card.  (Doc. No. 10 at ¶ 8.)  Then, after the officers seized the firearm from Defendant, Defendant stated he possessed the gun because his tires had recently been slashed.  (*Id.* at ¶ 10.)  Although Defendant argues both statements are the fruit of the illegal detention (*id.* at ¶ 16), only the second statement was made *after* the gun was seized and Defendant was under arrest. The Government agrees not to use Defendant's post-arrest statement regarding his gun possession at trial and therefore his request to suppress that statement is denied as moot.  (Doc. No. 11 at 1.)  And, as discussed herein, the first statement is admissible as it was made during the initial lawful traffic stop.

4), as were a photo of the area where the stop took place (Gov't Ex. 1), PPD Directive 4.21[2]

(Def.'s Ex. 28), and a PPD Vehicle/Pedestrian Investigation report from the day of the incident

(Def.'s Ex. 16).

For the reasons discussed below, the Court grants Defendant's motion.

## I.       Factual Background

On the morning of February 23, 2021, Officers Coyle, Rothman, and Rios were on a

routine tactical patrol in the 12th District.[3]  (Feb. 10, 2022 Hr'g Tr. ("Hr'g Tr.") at 9:16–19,

48:24–49:1, 67:16–18.)  Officer Rios was driving the marked patrol van, while Officer Rothman

was in the front passenger seat and Officer Coyle was in the rear.[4]  (*Id.* at 18:13–15, 62:23–63:1,

94:8–14.)  When the Officers turned on to the 6400 block of Windsor Street[5] that morning (*see*

*id.* at 12:7, 12:11–13, 14:23–15:1, 49:2–7; Gov't Ex. A), they observed a silver Honda Odyssey

that was parallel parked, but running, in front of a house on the residential street (Hr'g Tr. at

15:8–14, 51:4–11, 32:8–13).  The Officers noticed that the vehicle's windows were heavily

---

[2] Directive 4.21(4)(A) states, "Authorized Body-Worn Cameras will be activated prior to responding to all calls for service and during all law enforcement related encounters and activities involving the general public.  This shall include, but is not limited to . . . (3) When conducting any vehicle or pedestrian investigation [or] (4) When initiating a sight arrest or citation. . . ."  (Def.'s Ex. 28 at 3.)

[3] The 12th District is in Southwest Philadelphia.  (Hr'g Tr. at 10:9–14.)  Although the Officers are typically in a bike unit, they drove a van that day due to icy weather conditions.  (*Id.* at 48:15–20, 62:17–22, 90:21–25.)  The Officers were in uniform.  (*Id.* at 11:19–20.)

[4] The Officers offered conflicting testimony as to whether Officer Coyle was seated behind Officer Rios or behind Officer Rothman.  (*Compare id.* at 94:13–14 (Officer Rios's testimony that "Coyle was behind me in the back"), *with id.* at 12:3 (Officer Coyle's testimony that he "was seated behind the front passenger seat," i.e., behind Officer Rothman).)

[5] During his time as a patrol officer, Officer Coyle came to know the area around the 6400 block of Windsor Street to be "a general[ly] high crime area."  (*Id.* at 14:4–21, 41:13–22, 42:15–19 (explaining that he believed a gang, I-65, sold narcotics in the area).)  Officer Coyle also had previously recovered two firearms on the block adjacent to the 6400 block of Windsor from two "vetted members of I-65."  (*Id.* at 42:20–43:10.)  For his part, Officer Rothman testified that it is "a known dangerous block."  (*Id.* at 49:8–21 ("It's a vetted gang that operates out of there, I-65.  There [are] shootings, there's thefts, there's robberies, drug activities.  So it's a known block.").)

tinted,[6] which is a violation of the Pennsylvania Motor Vehicle Code, unless one of two limited

exception applies.[7]  (*Id.* at 15:8–16:18, 93:4–7; *see also id.* at 59:22–61:7; *id.* at 68:4–6 ("Q: So

the only reason you approached the car was the tints?  A: Yes, it was running with tint.").)  The

Officers did not run the license plate number prior to approaching the running vehicle.[8]  (*Id.* at

66:15–22.)

_____

[6] Officer Rios testified that it was significant that the car had tinted windows because in her "experience, a lot of people like to sit in their vehicles and smoke narcotics or do anything illegal or just even be in their vehicle in general."  (*Id.* at 93:22–94:1.)

[7] Officer Coyle testified that he encounters suspected illegal tint "every day, essentially" and has only once encountered a driver who fell within one of the exceptions.  (*Id.* at 17:7–17.)

[8] Despite Officers Coyle and Rothman testifying that PPD Directive 4.21 directed officers to turn on their body-worn cameras when conducting any vehicle or pedestrian investigation, *see supra* n.1, none of the three officers did so in this case.  (*See* Hr'g Tr. at 30:13–17 ("Q: And are you familiar – can you articulate the body camera policy?  A [Officer Coyle]: Not word for word, but it generally – you turn your camera on when you are responding to a call or when you are encountering someone."); *id.* at 70:14–71:4 ("Q: If you just want to read paragraph A [of Directive 4.21].  A [Officer Rothman]: Authorized body-worn cameras will be activated prior to responding to all calls for service and during all law enforcement related encounters and activities involving the general public . . . Q: . . . when conducting any vehicle or pedestrian investigation, which you can call this, right?  A: Correct.").)  And, here inexplicably, all three officers only remembered to turn on their cameras after interacting with Defendant for two or three minutes.  (*See id.* at 37:11–15 ("The Court: So, I mean, this could be a good two to three minutes after you first asked him to roll down his window?  A [Officer Coyle]: Yeah.  Yes."); *see also id.* at 25:17–22 ("Q: Did you record from the moment that you began interacting with the Defendant?  A [Officer Coyle]: No. I forgot to hit it as soon as I exited the vehicle, but as soon as I remembered, I turned it on immediately."); *id.* at 26:1–4 ("Q: When did you remember to hit the body cam?  A [Officer Coyle]: When he started exiting the vehicle is when I turned my camera on."); *id.* at 59:1–12 ("Q: And did you record all of or a portion of the encounter we just described?  A [Officer Rothman]: A portion of the encounter.  Q: Why only a portion?  A: Because in the beginning of the stop I was talking to him about getting him to roll the window down, so I was preoccupied at the time of what I believed was him trying to hide a firearm, so I was preoccupied with getting him to listen to what I was trying to tell him.  So once I finally got him out of the vehicle and the window rolled down, that's when I remembered to turn on my body camera."); *id.* at 102:2–10 (Officer Rios's testimony that she "must have forgotten" to turn on her body camera once she got of the vehicle).)

The body camera footage begins, without volume, when Defendant is already out of his car.  (*See* Gov't Exs. 2 (Officer Coyle), 3 (Officer Rothman), 4 (Officer Rios)).)  This means that the body cameras were not activated until after that point.  (*See* Hr'g Tr. at 68:19–69:3 ("Q: I want to understand a little bit better how the body cameras work.  Now, the first minute or so there is no sound, right?  A [Officer Rothman]: Yes, it's buffering.  Q: And the sound starts once you activate the camera, is that correct?  A: So once I activate the camera, it buffers for a minute before, and once you activate the camera it will go back a minute from before you hit the button.  And then once it meets that time, the sound will activate.").)

3

At that point, the Officers pulled up next to the vehicle[9] and knocked on the driver's window.[10]  Given the heavy tint, they were unable to see into the vehicle.  (*Id.* at 38:8–11.)  Defendant, who was sitting in the driver's seat, only rolled his window down part way,[11] which concerned the Officers.  Officers Rothman and Coyle "had to ask him several times to roll down the window all the way."  (*Id.* at 19:15–20:2, 53:6–13.)  Officer Coyle testified that Defendant "seemed nervous," "was very hesitant to roll down the window any further," and was "avoiding eye contact."  (*Id.* at 19:15–21.)  According to Officer Coyle, the fact that Defendant only rolled his window down to eye level "pose[d] an officer safety issue" because that, coupled with the heavy window tint, prevented them from seeing into the vehicle, so they could not discern what Defendant's "hands [were] doing or what may be in the vehicle" or whether anyone else was in the vehicle.  (*Id.* at 19:1–14.)

Officer Rothman testified that, given Defendant's reluctance to roll the window down, he immediately suspected that Defendant was concealing a weapon.  (*Id.* at 74:2–23 ("Q: At the

---

[9] Because the car was parallel parked and the Officers pulled up next to it, there was no room for Defendant to drive away.  (*Id.* at 32:14–20; *see also id.* at 63:14–64:19.)

[10] Officer Coyle and Officer Rothman's testimony differs.  Officer Coyle testified that after they pulled up to the vehicle, "[he] and [his] partner Officer Rothman *exited [the] car and then* knocked on the window to see if there was a driver in the car, because [they] could not see through the window."  (*Id.* at 18:5–9 (emphasis added).)  Officer Rothman, on the other hand, testified that he first knocked on the driver's window while he was still in the front passenger's seat of the van.  (*Id.* at 52:23–24; *see also id.* at 54:16–18 (Officer Rothman testifying that, when he knocked on Defendant's window, he was "sitting in the [police] van and [Defendant] was sitting in his van"); *id.* at 63:5–13 ("Q: And you knocked on his window from inside the police car?  A: Yes.").)  According to Officer Rothman, he did not get out of the car until Defendant "refused to roll the window down all the way."  (*Id.* at 53:3–5; *see also id.* at 54:18–22.)  To the extent that Officer Rothman remained in the vehicle while knocking on the driver's window, he would have had to lean almost his entire upper body out of the window.  (*Id.* at 64:14–16, 86:12–16; *see also* Gov't Ex. 3 at 1:14 (showing the distance between the two vehicles).)

[11] Officers Coyle and Rios testified that Defendant "cracked the window down to about eye level" (*id.* at 18:23–25, 94:20–21 ("The Defendant rolled down the window only enough that you could barely see his eyes")), while Officer Rothman, who was the officer who made the initial contact with Defendant, testified that Defendant rolled down the window to his chin (*id.* at 52:10, 72:2–8, 73:8–12).  The Officers agreed that it was cold out that day.  (*Id.* at 32:25–33:5, 50:22–25, 92:18–22.)

time that you asked him to roll the window down, you thought he had a firearm?  A: I believed

that he was concealing something, yes, that's why he would not roll the window down.  Q: Did

you see anything that would lead you to think that?  A: I told you that I could not see into the

vehicle, no, but the reason that he would only roll the window down to his chin I believe was to

conceal something, yes.  A: Conceal something, you didn't know what?  A: I believed it to be a

weapon, yes.  Q: I am just asking you, what was that based on?  A: That was based on him not

rolling the window down . . . and giving himself time to conceal something, because I had to ask

him multiple times to roll the window down."); *see also id.* at 59:5–8 ("[I]n the beginning of the

stop I was talking to him about getting him to roll the window down, so I was preoccupied at the

time of what I believed was him trying to hide a firearm."); *id.* at 80:20–81:3 (Q: "When the

Defendant first cracked the window to his chin, what was your kind of main concern in speaking

with him?  A: That he was concealing a firearm."); *id.* at 86:6–8 ("When I believed that he didn't

want to roll the window down, I believed him to be concealing the firearm in his genitale [sic]

area so, yes."); *id.* at 86:19–23 ("Q: And so at the moment that he only rolls the window down to

his chin is when you believed he was concealing a firearm?  A: Yes, I believed that he was

buying time to conceal it, yes.").)  According to Officer Rothman, Defendant "was irate" and

combative, "was kind of stuttering," and "just appeared very nervous as if he was concealing a

firearm." [12]   (*Id.* at 81:25–3; *see also id.* at 82:17–83:1 ("Q: But the description you just made

about being irate and appearing nervous, was that the case when you first encountered him?

A: Him being irate, yes.  Q: What about nervous?  A: In the beginning before he rolled down the

window, he was just very combative and very irate, and then eventually once we got the window

---

[12] As mentioned above, *supra* n.8, the body camera video does not start until *after* Defendant is out of the car; however, the video does not support Officer Rothman's testimony.  Defendant did not appear irate, combative, stuttering or nervous prior to his arrest.  (*See generally* Gov't Exs. 2, 3, 4.)

rolled down, we could see that he was nervous and – yeah, he was nervous.").)

Likewise, Officer Rios testified that Defendant seemed "a little nervous" and did not want to roll his window down completely, and in her experience, this typically indicates that "someone is just trying to hide something and they don't want to speak to us because they are doing something they are not supposed to be doing."  (*Id.* at 95:15–24; *see also id.* at 95:25–96:6 ("Q: And what about his behavior or demeanor made you think that he was nervous?  A: Just mostly it was the rolling down the window.").)

In addition, after Defendant first cracked his window, Officer Coyle "detect[ed] the odor of freshly burned marijuana" (*id.* at 19:6–7), and Officer Rothman smelled burnt marijuana and thought it appeared "smoky in the vehicle"[13] (*id.* at 53:14–23).  Officers Coyle and Rothman asked Defendant if he had been smoking marijuana; he responded yes but said that he had medical marijuana card.[14]  (*Id.* at 20:10–13.)  This indicated to them that he was operating a vehicle under the influence.[15]  (*Id.* at 21:5–16, 44:4–25.)

Although the Officers asked Defendant to get out of his vehicle, they did *not* ask for his driver's license or registration.  (*See id.* at 80:7–10; *see also* Gov't Ex. 3 at 3:07–3:11 (showing the license was obtained after the arrest).)  And they allowed Defendant to reach back into his vehicle to retrieve his phone.  (*See* Gov't Ex. 2 at 00:00–00:07; Gov't Ex. 3 at 00:00–00:06.) The Officers also allowed Defendant to walk around for over a minute and a half, eventually

---

[13] Later on, once Officer Rios exited the police van and stood near Defendant, she testified that she also smelled marijuana.  (*Id.* at 99:10–13 ("It smelt like marijuana coming from his person.").)

[14] Defendant was unable to locate his medical marijuana card.  (Hr'g Tr. at 20:14–22, 21:20–25.)

[15] The Officers did not conduct any field sobriety tests on Defendant to test whether he was impaired.  (*Id.* at 45:1–8.)  Nor did they ultimately recover any marijuana from his vehicle or his person.  (*Id.* at 33:23–34:3, 106:13–17.)

directing him to the rear of his vehicle, while they continued to allow him to attempt to locate his medical marijuana card on his phone.[16]  (*See* Gov't Ex. 2 at 00:00–00:52; Gov't Ex. 3 at 00:06–1:38; *see also* Hr'g Tr. at 35:19–36:23, 55:11–17, 96:19–22.)  After Defendant stepped to the rear of the vehicle, Officer Coyle frisked the driver's seat area of the car; he did not locate any contraband.  (Hr'g Tr. at 22:14–23.)

Notwithstanding the fact that Defendant was allowed to move around after he exited the car for at least a minute and a half, the Officers testified that they believed that he was carrying a firearm in his groin area.[17]  (*See, e.g.*, *id.* at 56:23–57 ("Q: So even while we see on the body-worn camera that he is looking on his phone, kind of walking around the van, during that time you suspect that he has a firearm?  A: Yes.").)  Specifically, Officer Coyle testified that as soon as Defendant stepped out of his car, he noticed that "there was definitely a bulge in [Defendant's] pants."  (*Id.* at 23:17–18.)  Likewise, Officer Rothman testified that as soon as Defendant "stepped out of the vehicle," Rothman noticed "a very large bulge in [Defendant's] groin area," which he "believed to be a firearm."  (*Id.* at 56:10–16; *see also* Gov't Ex. 4 at 6:40–6:48; Hr'g Tr. at 61:19–23 ("I was commenting on right when I asked him to step out of the vehicle, the bulge in his groin that I believed to be a firearm, because it's not like – it was huge.

---

[16] Officer Rios believed Defendant's scrolling on his phone to find his marijuana card was a delay tactic. (Hr'g Tr. at 99:2–7 ("He was trying to look for it in his phone but could not find it, just kept trying to, like, delay . . . . From my experience that's just the tactic to say, like, I don't have it, I am just trying to distract you."); *see also id.* at 99:17–22.)

Officer Rothman testified, "When he was on his phone it appeared to me he was scrolling aimlessly.  I don't think he actually knew where it was, and a document like that you would think you would know where it is on your phone."  (*Id.* at 55:25–56:7.)  However, in this COVID-19 era, it is well established that when an individual needs to locate a vaccine card on a smart phone, it can take some time to find, especially when one feels pressured to find it.

[17] The body camera footage shows that Defendant's pants hung low, such that the waistband was located under his buttocks.  (*See* Gov't Ex. 3 at 0:03.)  Defendant also appears to have two pairs of underpants underneath, one also hung low and the other rested on his waist.  (*See id.*)

The bulge in his waistband was that huge that I thought it was a gun."); *id.* at 78:10–17 ("I saw a

gigantic bulge in his groin, yes, which I thought – which I knew was a firearm – believed was a

firearm.").)  According to Officer Coyle, as Defendant walked to the rear of his vehicle, "you

could see he was walking with like a slight waddle," which also indicated to Officer Coyle that

Defendant had "something in his waistband."  (*Id.* at 22:4–13, 23:18–19.)  And Officer Rios

testified that although Defendant's back was towards her at first, once he turned to the side, she

"could see in his groin area a large bulge," which she believed to be a handgun because she

"ha[s] never met anybody that is that big" before.  (*Id.* at 97:3–15; *see also id.* at 97:15–17 ("It

just looked a lot larger like something was there, like, that is not normal.").)

Yet Officer Rothman did not conduct a pat down immediately.  (*See, e.g.*, *id.* at 78:13–

70:13.)  Officer Rothman testified that he did not act faster because he did not want to escalate

the situation and because "[they] had [Defendant] in an advantageous spot" since he was stuck

between his car and the police van, with Officer Rothman behind him, Officer Coyle in front of

him, and Officer Rios on the side of him, and there were snowy and icy conditions.  (*Id.* at 83:2–

15; *see also id.* at 56:17–22, 57:5–9.)  Similarly, Officer Rios testified that Officer Rothman did

not immediately pat down Defendant because they were "trying to keep the situation calm"[18] and

"to deescalate the situation."  (*Id.* at 98:5–17.)

After Defendant had been searching for his medical marijuana card on his phone for well

over a minute as captured on the body cameras (and likely an additional two or three minutes

before the recording began), Officer Rothman "had him put his hands up on the back of the

vehicle" and "frisk[ed] him" and found "the firearm right where [he] thought it was, in his

---

[18] Officer Rios testified that she was also "trying to keep [Defendant] calm" by telling him, while he was
scrolling through his phone, "As long as you show that medical marijuana card you will be cool."  (*Id.* at
104:12–18.)

groin." (*Id.* at 57:10–17; Gov't Ex. 4 at 00:00–1:40; Gov't Ex. 3 at 0:00–2:11.)  While patting

Defendant down, once he felt the firearm, Officer Rothman stated, "What is that?  What is that?

What's in there?  You got to pull it out or I got to pull it out."  (Gov't Ex. 3 at 1:53–2:11; *see*

*also* Hr'g Tr. at 79:24–80:1 ("Q: Did you just ask him, are you going to pull that out or am I

going to pull that out?  A: Yes.").)  Officer Rothman testified that although he knew it was a gun,

he asked Defendant to "pull it out" because the firearm "was on [Defendant's] genitalia" and

Officer Rothman "didn't want to grab his genitalia."  (*Id.* at 80:2–6.)

Ultimately, Officer Rothman recovered the firearm, a loaded Taurus G2C 9MM and

made it safe by removing the ammunition.  (*Id.* at 57:18–22.)  The Officers then handcuffed and

arrested Defendant.  (*Id.* at 100:11–21.)

## II.     The Parties' Arguments

Defendant argues that the Officers lacked reasonable suspicion to conduct, and extend,

the initial traffic stop and that the Officers violated his right to be free from unreasonable

searches and seizures when they searched and unlawfully detained him.  (Doc. No. 10.)

In response, the Government argues that the Officers had reasonable suspicion to conduct

the stop because Defendant's vehicle had window tint, a violation of the Motor Vehicle Code,

and that the Officers reasonably suspected that Defendant was armed based on the circumstances

of the stop and in particular, that the Officers observed a large bulge in Defendant's groin area as

soon as he stepped out of the car.  (Doc. No. 11.)

## III.     Standard of Review

As a general matter, a defendant who moves to suppress evidence bears the burden of

proof.  *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).  "However, once the defendant

has established a basis for his motion, i.e., the search or seizure was conducted without a

warrant, the burden shifts to the government to show that the search or seizure was reasonable."
*Id.*; *see also United States v. Cole*, 425 F. Supp. 3d 468, 484 (W.D. Pa. 2019) ("The defendant's
burden is easily satisfied when law enforcement conducted the challenged search or seizure
without a warrant.").  The Government must satisfy its burden of proof by a preponderance of
the evidence.  *See, e.g.*, *Cole*, 425 F. Supp. 3d at 484.

IV.   **Discussion**

A.  *The Stop*

The Fourth Amendment protects people against unreasonable searches and seizures.  U.S.
Const. amend. IV.  "Generally, for a seizure to be reasonable under the Fourth Amendment, it
must be effectuated with a warrant based on probable cause."  *United States v. Lewis*, 672 F.3d
232, 237 (3d Cir. 2012) (quoting *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002)).
It is well-settled that a traffic stop is a "seizure" under the Fourth Amendment.  *See, e.g.*, *United
States v. Johnson*, 452 F. App'x 219, 225 (3d Cir. 2011).  As the Third Circuit has explained, the
Supreme Court established a "bright-line rule that any technical violation of a traffic code
legitimizes a stop, even if the stop is merely pretext for the investigation of some other crime."
*United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006) (citing *Whren v. United States*, 517
U.S. 806 (1996)).  The reasonable suspicion standard applies to routine traffic stops.  *Johnson*,
452 F. App'x at 225.

Because "*any* technical violation of a traffic code legitimizes a stop," *Mosley*, 454 F.3d
252 (emphasis added), and having tinted windows is a violation of 75 Pa. Stat. & Cons. Stat. §
4524 (prohibiting the operation of "any motor vehicle with any sun screening device or other
material which does not permit a person to see or view the inside of the vehicle through the
windshield, side wing or side window of the vehicle"), the Court concludes that Officers Coyle,

Rothman, and Rios had reasonable suspicion to conduct the traffic stop.  (*See, e.g.*, Gov't Ex. 3

at 0:00–0:14 (footage showing that Defendant's vehicle had dark tinted windows); Gov't Ex. 2 at

0:00–0:21 (same); Hr'g Tr. at 15:13–17 (Officer Coyle's testimony that the windows were

"heavily tinted"); *id.* at 51:9–11 (Officer Rothman's testimony that there was "window tint all

around the vehicle"); *id.* at 93:4–7 (Officer Rios's testimony that the vehicle "had extremely dark

tinted windows"); *see also id.* at 18:8–9, 38:11 (Officer Coyle's testimony that he could not see

through the driver's window); *id.* at 52:6–7 (Officer Rothman's testimony that he could not see

into the vehicle).)  *See United States v. Smith*, Criminal Action No. 21-385, 2021 WL 5918580,

at *5 (E.D. Pa. Dec. 15, 2021) ("Here, the Government has sufficiently shown that the officers

had reasonable suspicion to believe that the car's windows were unlawfully tinted, and the traffic

stop did not violate Defendant's Fourth Amendment rights.  The record establishes that both

officers recalled Defendant's windows being tinted to such a degree of darkness that the officers

could not see inside the car."); *United States v. Spry*, Criminal Action No. 20-84, 2021 WL

5925936, at *1 (E.D. Pa. Dec. 15, 2021) ("The officer gave some further details about the

difficulty seeing inside the vehicle . . . . The Court also observed certain photographs of

Defendant's vehicle.  Based on the testimony and these photographs, the Court finds that there

was reasonable suspicion that the Defendant may have violated this section of the Motor Vehicle

Code which warranted the officer approaching the vehicle and questioning defendant.").

Defendant's contention that the Officers lacked reasonable suspicion because they did not

measure the tint on his window to see if it constituted an unlawful amount of tint—nor did they

discern whether the tinted windows were installed by the manufacturer or whether he had a

medical exemption at the time of the stop[19]—is unavailing.  (*See* Doc. No. 10 at 6–7.)  In *United*

_____

[19] Although Pennsylvania law prohibits driving a motor vehicle "with any sun screening device or other
material which does not permit a person to see or view the inside of the vehicle through the windshield,

*States v. Hall*, the Third Circuit rejected a nearly identical argument.  270 F. App'x 123, 126 (3d

Cir. 2008).  There, the defendant argued that the officers did not have reasonable suspicion

because, at the time of the stop, they had no way of knowing whether the tinted windows were

installed by the manufacturer.  *Id.*  The appellate court disagreed, reasoning, "regardless of

whether [the defendant's] tinted windows were installed by the manufacturer of his vehicle, the

window tint provided reasonable suspicion justifying the stop.  The reasonable suspicion analysis

does not 'deal with hard certainties, but with probabilities.'"  *Id.* (quoting *United States v.*

*Cortez*, 449 U.S. 411, 418 (1981)).  Because the tinted windows prevented the officers from

viewing the interior of the defendant's vehicle, and "such tinting is, with limited exception, a

violation of Pennsylvania law," the court concluded that the officers had reasonable suspicion

that the defendant had violated a traffic ordinance.  *Id.*  "The officers' inability to determine at

the time of the stop whether [the defendant's] windows were tinted by the [vehicle's]

manufacturer does not mean that the stop was unsupported by reasonable suspicion."  *Id.*

The same logic applies here.  The Court finds credible the Officers' testimony that the

windows on Defendant's vehicle were heavily tinted and that they could not see inside the

vehicle, and the body camera footage from the scene supports this testimony.  In Pennsylvania,

such window tint is a violation of state law, unless a limited exception applies.  "Viewing these

facts from the perspective of a reasonable law enforcement officer, the window tint on

[Defendant's] vehicle was sufficient to establish reasonable suspicion that [Defendant] had

violated a traffic ordinance."  *Hall*, 270 F. App'x at 126.  The fact that the Officers did not

measure the tint on his window to see if it constituted an unlawful amount of tint and did not

---

side wing or side window of the vehicle," *see* 75 Pa. Stat. & Cons. Stat. § 4524(e)(1), that subsection does
not apply if the tinted windows "were installed by the manufacturer of the vehicle" or if a "valid
certificate of exemption for medical reasons has been issued," *see id.* § 4524(e)(2)(i)–(ii).

know whether the tinted windows were installed by a manufacturer, nor did they know whether

Defendant had a medical exemption, does not change this reasonable suspicion analysis.  *See id.*

Because the Court concludes that the Officers had reasonable suspicion to believe that

Defendant violated a traffic ordinance, the initial stop was lawful, and the Court denies

Defendant's motion to suppress on this ground.[20]

### B.  *The Search and Seizure*

Next, Defendant asserts that the Officers impermissibly extended the initial traffic stop, a

seizure in violation of the Fourth Amendment, and conducted an impermissible pat down, a

search in violation of the Fourth Amendment.  (Doc. No. 10.)

As "[t]he Supreme Court has repeatedly recognized," "traffic stops are dangerous

encounters that result in assaults and murders of police officers."  *United States v. Moorefield*,

111 F.3d 10, 13 (3d Cir. 1997) (citations omitted).  It is well-settled that a police officer

executing a valid traffic stop "may exercise reasonable superintendence over the car and its

passengers."  *United States v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004).

As a preliminary matter, Officers Coyle and Rothman were permitted to question

Defendant and order him out of the car.  *See, e.g.*, *United States v. Yamba*, 407 F. Supp. 2d 703,

708 (W.D. Pa. 2006), *aff'd*, 506 F.3d 251 (3d Cir. 2007) (explaining that two Supreme Court

cases, *Pennsylvania v. Mimms*, 434 U.S. 106 (1977) and *Maryland v. Wilson*, 519 U.S. 408

(1997), "demonstrate that a police officer may order the driver and passengers to exit the vehicle

while the stop is being conducted").  That the Officers questioned Defendant about the smell of

marijuana emanating from his vehicle as soon as he rolled his window down does not render the

---

[20] *See supra* n.1.  It was during this initial traffic stop that Defendant admitted to using marijuana, and because this statement occurred during a lawful traffic stop, after the officers smelled burnt marijuana and saw smoke in Defendant's vehicle, the Court finds it is admissible.

stop unlawful.  *See, e.g., Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("A lawful roadside stop

begins when a vehicle is pulled over for investigation of a traffic violation . . . . An officer's

inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain,

do not convert the encounter into something other than a lawful seizure, so long as those

inquiries do not measurably extend the duration of the stop.").

Moreover, a police officer "may pat down the occupants of the vehicle and conduct a

search of the passenger compartment, if he has a reasonable suspicion that the occupants might

be armed and dangerous."  *Bonner*, 363 F.3d at 216; *see also United States v. Colen*, 482 F.

App'x 710, 711 (3d Cir. 2012) ("[W]here—as here—police conduct a valid traffic stop[,] they

may conduct a limited search for weapons by patting-down the driver and/or occupants of the

stopped vehicle for their own protection."); *United States v. Goode*, 486 F. App'x 261, 264 (3d

Cir. 2012) ("[T]he police only needed a reasonable suspicion that they were dealing with an

armed and dangerous individual to permit a reasonable search for weapons." (cleaned up)).

Nevertheless, the officer must be able to identify "specific and articulable facts which,

taken together with rational inferences from those facts, reasonably warrant that intrusion."

*Moorefield*, 111 F.3d at 11 (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)).  And, as the Supreme

Court has held, "in a traffic stop setting, the first *Terry* condition—a lawful investigatory stop—

is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry

into a vehicular violation . . . . To justify a patdown of the driver . . . during a traffic stop . . . , the

police must harbor reasonable suspicion that the person subjected to the frisk is armed and

dangerous."  *Arizona*, 555 U.S. at 327; *see also id.* ("In [*Terry*], the Court considered whether an

investigatory stop (temporary detention) and frisk (patdown for weapons) may be conducted

without violating the Fourth Amendment's ban on unreasonable searches and seizures.  The

14

Court upheld 'stop and frisk' as constitutionally permissible if two conditions are met.  First, the

investigatory stop must be lawful . . . . Second to proceed from a stop to a frisk, the police officer

must reasonably suspect that the person is armed and dangerous."  (citing *Terry*, 392 U.S. 1)).

In assessing whether reasonable suspicion exists, this Court must consider the totality of

the circumstances (i.e., the whole picture).  *See, e.g.*, *Colen*, 482 F. App'x at 712; *Goode*, 486 F.

App'x at 264.  As the Third Circuit has recognized, "[c]ourts give considerable deference to

police officers' determinations of reasonable suspicion."  *Mosley*, 454 F.3d at 252.

Here, although the Officers were permitted to order Defendant out of the car and extend

the traffic stop to question him about the smell of marijuana and smoke emanating from his

vehicle, the Court cannot conclude based on the facts here that the Officers had reasonable

suspicion that Defendant was armed and dangerous to objectively justify a pat down for

weapons.[21]  This is because the Officers' testimony as to the circumstances that led to the pat

down search for weapons—which resulted in the recovery of a firearm from Defendant's groin

area—is largely not credible and defies logic.  *Contra Spry*, 2021 WL 5925936, at *2–3 (denying

motion to suppress where the officer's testimony "was fully credible").

In particular, the Court finds that Officer Rothman's testimony lacks credibility.  First,

Officer Rothman testified that Defendant was irate and combative but the body camera footage

belies this assertion—Defendant appears rather calm.  Second, Officer Rothman was adamant

that he immediately suspected that Defendant was concealing a weapon, *before he even saw*

*Defendant*, because Defendant was reluctant to roll his window all the way down.  (*See, e.g.*,

---

[21] The Court notes that the Philadelphia City Council has rendered the possession of 30 grams or less of
marijuana a non-criminal violation.  *See* Philadelphia City Council Ordinances §§ 10-2101 & 10-2102
(defining possession of a small of marijuana as 30 grams or less of marijuana a civil violation punishable
by a civil fine).

Hr'g Tr. at 74:2–23.)  But, as all three officers testified, it was cold outside that day, so

Defendant may have only cracked his window to keep the cold air out of his vehicle.  Third,

Officer Rothman testified that as soon as Defendant stepped out of the vehicle, he noticed a large

bulge in Defendant's groin area, which he believed to be a gun.  (*Id.* at 56:10–16; *see also* Gov't

Ex. 4 at 6:40–6:48; Hr'g Tr. at 61:19–23.)  But Officer Rothman's actions undermine this very

testimony.  After Defendant exited his vehicle, the Officers allowed him to reach back into the

vehicle for his phone and did not pat him down, or otherwise restrain his movements, for at least

one minute and 38 seconds (and perhaps longer, as the body camera footage does not show the

entire encounter).  It strains credulity that Officer Rothman believed that Defendant was armed

and dangerous from the beginning, yet allowed Defendant to lean back into his car, to search his

phone for his medical marijuana card, and to walk around for that length of time[22] rather than

*immediately* conducting a pat down for officer safety.  Fourth, the body camera footage reveals

that while patting Defendant down, before recovering the firearm, Officer Rothman stated,

"What is that?  What is that?  What's in there?  You got to pull it out or I got to pull it out."

(Gov't Ex. 3 at 1:53–2:11; *see also* Hr'g Tr. at 79:24–80:1.)  Given that Officer Rothman *invites*

Defendant to pull a loaded gun out of his pants, the Court has great difficulty believing that

Officer Rothman actually suspected that Defendant had a gun and was concerned for officer

safety.

Officer Coyle's and Officer Rios's testimony fares slightly better but also lack credibility.

Officer Coyle testified that he noticed a bulge in Defendant's pants when Defendant exited the

car and that when Defendant walked to the rear of the car, he believed Defendant was carrying a

---

[22] Because the whole stop is not captured on the body camera footage, it is likely that several minutes passed before the Officers decided to conduct the safety pat down, given that they thought Defendant had a gun around the time that they first knocked on his window.

16

firearm because Defendant walked with a slight waddle. (Hr'g Tr. at 22:4–13, 23:18–19.)

Again, the Court struggles to credit this assertion, given that Officer Coyle's conduct illustrates

that he was more concerned about searching the driver's seat area of Defendant's vehicle than

patting down Defendant for officer safety. (*See* Gov't Ex. 2 at 1:25–1:58.) Last, Officer Rios

testified that the Officers did not immediately pat Defendant down because they were trying "to

deescalate the situation." (Hr'g Tr. at 98:5–17.) But, as even Officer Rios admits, the situation

was rather calm. (*Id.* at 112:24–113:1; *see generally* Gov't Exs. 2, 3, 4.) Therefore, because

there was nothing to "deescalate," the Court cannot credit Officer Rios's testimony as to why the

Officers delayed conducting the pat down.

The Court recognizes that the stop occurred in a high crime area, which the Officers were

well aware of given their experience with the 12th District, but the Court cannot view this fact in

a vacuum. Rather, the Court must consider the totality of the circumstances, which, here,

includes that the encounter occurred in the daylight at 10:00 a.m., that Defendant appeared

cooperative and presented with a calm demeanor while interacting with the Officers, that the

Officers permitted Defendant to reach back into his car after he had exited it, and that the

Officers did not ask for Defendant's driver's license or registration and allowed Defendant to

walk around and scroll through his cell phone for over a minute and a half. And, then during the

pat down allegedly conducted for officer safety, Officer Rothman asked Defendant to reach into

his pants and remove the hidden item, ultimately found to be a loaded firearm. Considering the

totality of the circumstances, the Court is unable to find that the Officers had reasonable

suspicion that Defendant was armed and dangerous.

Accordingly, the Court grants Defendant's motion to suppress.[23]

---

[23] This would be a different case if the Officers had immediately conducted a pat down for officer safety
upon asking Defendant to step out of his car or if the Officers had testified that while Defendant was

## V.      Conclusion

For the foregoing reasons, the Court grants Defendant's motion to suppress.[24]

An appropriate Order follows.

---

searching for his medical marijuana card they saw the bulge and then suspected Defendant was armed and dangerous.  But given the facts presented here—the Officers believed Defendant to be armed and dangerous from the minute they pulled up alongside his parked running car, and yet after they asked Defendant to step out of his car they allowed him to walk around and ultimately *invited* Defendant to reach into his own pants—the Court cannot find that the pat down was conducted because the Officers thought Defendant was armed and dangerous.

[24] Any statements that Defendant made during the pat down would also be suppressed.